CLERK'S OFFICE
A TRUE COPY
Oct 01, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
414-460-9608 with IMEI: 356830361124670 (the "Target Cell Phone 1") and 414-243-1392 with IMEI: 352700320439870 (the "Target Cell Phone 2"), as further described in Attachment A1

Case No. 25-M-494 (SCD)
Matter No. 2024R438

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the ______ District of ______ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A1.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B1.

**YOU ARE COMMANDED** to execute this warrant on or before 10-15-25 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to Hon. Stephen C. Dries.
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for ____ days *(not to exceed 30)* ☑ until, the facts justifying, the later specific date of 04/29/2026.

Date and time issued: 10-1-25 10:05 am

Stephen C. Dries
*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Stephen C. Dries U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| --- | --- | --- |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

# <u>ATTACHMENT A1</u>
## Property to Be Searched
## MATTER NUMBER 2024R438

1. Records and information associated with the cellular devices assigned call number **414-460-9608** with **IMEI: 356830361124670** (the "**Target Cell Phone 1**") and **414-243-1392** with **IMEI: 352700320439870** (the **"Target Cell Phone 2"**) with listed subscriber unknown, whose service provider is Dish Wireless LLC ("Service Provider") a wireless telephone service provider headquartered at 9601 Meridian Blvd, Englewood, CO 80112, with services also attached to AT&T, headquartered at 1025 Lenox Park Blvd., Atlanta, GA 30319 or any other cell phone servicing company currently servicing these phone numbers and IMSI number's during the requested period.

2. The **Target Cell Phone 1 and 2**.

**ATTACHMENT B1**
**Particular Things to be Seized**
**MATTER NUMBER 2024R438**

## I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A1 is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A1:

a. The following subscriber and historical information about the customers or subscribers associated with the **Target Cell Phone 1 and 2** for the time period from August 1, 2025, to present:

   i. Names (including subscriber names, user names, and screen names);

   ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii. Local and long distance telephone connection records;

   iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v. Length of service (including start date) and types of service utilized;

   vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Target Cell Phone 1 and 2**, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(B) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

b. Information associated with each communication to and from the **Target Cell Phone 1 and 2** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phone 1 and 2**or will connect at the beginning and end of each communication.

The Court has also issued an order(s) pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the **Target Cell Phone 1 and 2**.

c. Information about the location of the **Target Cell Phone 1 and 2**for a period of **30 days**, during all times of day and night. "Information about the location of the **Target Cell Phone 1 and 2** includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by

initiating a signal to determine the location of the **Target Cell Phone 1 and 2** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of distribution and possession with intent to distribute controlled substances; conspiracy to distribute and possess with the intent to distribute controlled substances; maintain drug involved premises; use of a communication facility in furtherance of a drug trafficking offense, violations of Title 21, United States Code, Sections 841, 843(b), 846, and 856, have been committed by Russell V. MCDADE (DOB XX/XX/1980), Samuel P. STAIR, a.k.a. "Sam STAIR", (DOB XX/XX/1974), Walter RINGERSMA (DOB XX/XX/1965), Russell V. MCDADE JR. (DOB XX/XX/2003) and other unidentified subject(s) since at least August 2024.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this warrant.

CLERK'S OFFICE
A TRUE COPY
Oct 01, 2025
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

414-460-9608 with IMEI: 356830361124670 (the "Target Cell Phone 1") and 414-243-1392 with IMEI: 352700320439870 (the "Target Cell Phone 2") , as further described in Attachment A1

Case No. 25-M-494 (SCD)

Matter No. 2024R438

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A1

located in the ______________ District of ______________________, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B1

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. 841, 846, 856; and 843(b) | Distribution and possession with intent to distribute controlled substances; conspiracy to do the same; maintain drug involved premises; use of a communication facility in furtherance of a drug trafficking offense |

The application is based on these facts:

See Attached Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* 04/29/2026 *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Curt R Hansen
*Applicant's signature*

Curt Hansen, SA HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 10-1-25

Stephen C. Dries
*Judge's signature*

City and state: Milwaukee, Wisconsin

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT
MATTER NUMBER 2024R438**

I, United States Department of Homeland Security Investigations (HSI) Special Agent Curt Hansen, being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephones assigned call numbers:

**a.** **414-460-9608** with **IMEI: 356830361124670** (the "**Target Cell Phone 1**") with listed subscriber unknown, whose service provider is Dish Wireless LLC ("Service Provider") a wireless telephone service provider headquartered at 9601 Meridian Blvd, Englewood, CO 80112, with services also attached to AT&T, headquartered at 1025 Lenox Park Blvd., Atlanta, GA 30319 or any other cell phone servicing company currently servicing **Target Cell Phone 1** numbers and IMSI number during the requested period; and

**b.** **414-243-1392** with **IMEI: 352700320439870** (the **"Target Cell Phone 2"**) with listed subscriber unknown, whose service provider is Dish Wireless LLC ("Service Provider") a wireless telephone service provider headquartered at 9601 Meridian Blvd, Englewood, CO 80112, with services also attached to AT&T, headquartered at 1025 Lenox Park Blvd., Atlanta, GA 30319 or any other cell phone servicing company currently servicing **Target Cell Phone 2** number and IMSI number during the requested period; and

a. **414-732-3682** (the **"Target Cell Phone 3"**) with listed subscriber Samual P. STAIR, and listed address of 11512 W. Woodside Dr, Hales Corners, WI, whose service provider is T-Mobile ("Service Provider") a wireless telephone service provider headquartered 4 Sylvan Way, Parsippany, NJ 07054;

(collectively herein referred as **Target Cell Phones).**

2. The **Target Cell Phones** are described herein and in Attachment As, and the location information to be seized is described herein and in Attachment Bs.

3. In this application, the United States seeks (1) historical cell-site location information; (2) historical precision location information; (3) prospective, real-time cell-site location information; (4) prospective, real-time precision location information (i.e., E-911 Phase II data and GPS); and (5) subscriber information and other historic non-content records and information.

4. Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the **Target Cell Phones**.

5. I am a Special Agent of HSI, assigned to the Resident Agent in Charge (RAC) Milwaukee, Wisconsin. I have been employed with HSI as a Special Agent for approximately

four years. Prior to employment with HSI, I worked as a Deputy United States Marshal, Federal Air Marshal, and United States Border Patrol Agent. I have been a sworn federal law enforcement officer specifically investigating crimes involving narcotics, firearms, smuggling, terrorism, and immigration since September 2011. Throughout my law enforcement career, I have received training in general law enforcement and in specialized areas including narcotics and human smuggling. I am an investigator or law enforcement officer of the United States within the meaning of Title 8, United States Code, Section 1357(a)(5), that is, an officer of the United States who is empowered to conduct investigations of, and to make arrests for, certain offenses enumerated in Titles 8, 18, 19, 21, and 31 of the United States Code, and other related offenses. Since becoming employed as a federal agent, I have completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Brunswick, Georgia. As part of my duties and responsibilities as an HSI Special Agent, I am authorized to investigate crimes that involve narcotics violations pursuant to Title 21, United States Code.

6. As part of my duties as an HSI Special Agent, I have experience conducting criminal investigations involving narcotics, firearms, gangs, and human trafficking and have participated in the execution of search warrants in such investigations. I am familiar with various methods of smuggling and trafficking narcotics and other controlled substances and the proceeds from sale of such substances. I am also familiar with methods used to evade detection of both the controlled substances and the proceeds from their sale that are used by drug traffickers. Through my training and experience, I am familiar with the way in which narcotic traffickers conduct their business, including, but not limited to: the types and amounts

of drugs distributed; the types and amounts of profits made; the methods of importing and distributing controlled substances; the use of mobile telephones, email accounts, and the Internet to facilitate their transactions; and the use of numerical codes and code words to conduct their dealings.

7. I have participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws. These warrants involved the search of locations including: residences of targets, their associates and relatives; "stash houses" (i.e., houses used as drug/money storage locations); storage facilities; cellular/camera phones; and computers. Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized from the distribution and sale of controlled substances, and monetary instruments and various assets that were purchased with the proceeds of the drug trafficking. I have participated in the execution of multiple federal search warrants.

8. Additionally, I have received training related to the investigations and enforcement of drug trafficking laws. As a result of this training and my experience, I am familiar with the technologies of drug traffickers. I know that drug traffickers often use electronic equipment and wireless and landline telephones to conduct drug trafficking operations. I know drug traffickers often use electronic devices, such as cellular devices, to generate, transfer, count, record, or store the information described above and conduct drug trafficking. I am familiar with computers, cellular devices, and other electronic media or electronic storage devices and their uses by drug traffickers to communicate with suppliers, customers, co-conspirators, and fellow traffickers. I know that drug traffickers often keep

documents and records about the transportation, sourcing, ordering, sale, and distribution of controlled substances. These documents and records and additionally receipts, notes, ledgers, and other documents regarding drug trafficking are often maintained where the traffickers have ready access. These may be stored computers, cellular devices, and other electronic media or electronic storage devices. These devices often contain evidence of illegal activities in the form of communication records, voicemail, email, text messages, video and audio clips, location information, business records, and transaction records. I know drug traffickers take, store, preserve, or maintain photographs or videos of themselves, their associates, their property, their drugs, and their drug proceeds. These traffickers usually maintain these photographs or videos on computers, cellular devices, and other electronic media or electronic storage devices. Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime; and (2) the objects may have been used to collect and store information about crimes. I know the following information can be retrieved to show evidence of use of a computer or smartphone to further the drug trade: system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; computer media and any data contained within such media; operating system software, application or access program disks, manuals, books, brochures, or notes, computer access codes, user names, log files, configuration files, passwords, screen names, email addresses, IP addresses, and SIM cards.

9. I am familiar with the language used over the telephone and other electronic

communications to discuss sex and drug trafficking and know that the language is often limited, guarded, and coded. I am familiar with various code names used to describe controlled substances, as well as various code words used to describe commercial sex acts. I also know that drug traffickers and sex traffickers often use electronic devices (such as computers and cellular phones), electronic communication services (such as e-mail and messaging services), and social media to facilitate these crimes.

10. Further, based on training and experience, I am aware that it is a common practice within a drug trafficking organization to have various tasks assigned to persons involved in the organization. The members of the organization may have certain tasks, dependent on their hierarchy within the organization. It is common for those in charge of the organization to use those below them to make deliveries, transport, and hold/take possession of items, such as controlled substances and/or narcotics for distribution or firearms for protection/intimidation. The persons higher in the drug trafficking organization often avoid conducting the hand-to-hand transaction in order to insulate themselves, to avoid apprehension/detection from law enforcement.

11. Further, I am aware through training and experience, as well as numerous conversations with both users of controlled substance and dealers of controlled substances, that often times "drug houses", also called "trap houses", are established as places where drug users take up residence at one place. It is common that these "drug houses" or "trap houses" are engaged in prostitution where drugs are both used and sold. It is a common practice for drug users to trade sexual favors for drugs and / or trade sexual favors for money to buy drugs at these places. It also becomes a common practice for persons to bring stolen items to these

places in the hopes to trade them for drugs or money that can be used to purchase drugs. These residences help drug dealers impede law enforcement from making observations of what is taking place inside the residence, and obfuscate criminal investigations by storing illegal drugs inside a place with multiple users of the illegal drugs, as it creates confusion as to who is the owner of the drugs inside the residence might be. These types of "drug houses" are at times run by persons that are trusted to hold drugs and money and are usually armed or given armed protection to perform this task.

12. I have conducted investigations ranging from death, drug, property, and human trafficking crimes by analyzing cell phone data including tower usage, call activity, and cellular activity while trying to pinpoint certain locations of suspects and/or victims. I know that when conducting an investigation into many drug investigations, and human trafficking investigations that the cellular phone data will be a key piece of evidence based on my training and experience. Individuals who sell and use narcotics and who engage in the trafficking of others will mainly utilize their cell phone to set up a transaction utilizing their cellular phone or a special application downloaded on their phone. I know it is common practice for most people to rely heavily on the use of cellular telephones or electronic devices for many aspects of their daily lives. People commonly use cellular telephones or electronic devices to send and receive text messages, make voice calls, interact on social media, store contact information, store personal identifying data, maintain calendars or agendas, utilize maps or GPS functions, access the internet, and take photographs and videos. The same is true for those that engage in drug trafficking and human trafficking.

13. I have participated in numerous investigations involving the seizure of

computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these devices. I have also participated in investigations involving the use of historical and prospective location information to identify targets, map patterns of travel, corroborate other evidence, and apprehend persons to be arrested. On numerous occasions, this electronic evidence has provided proof of the crimes being investigated and corroborated information already known or suspected by law enforcement. During the course of my investigations, I have regularly used electronic evidence relating to the commission of criminal offenses, including intent, motive, manner, means, and the identity of co-conspirators.

14. Information contained in this affidavit was either obtained directly by me or by other investigators who I believe to be truthful and credible. The facts in this affidavit come from personal observations, training and experience, and information obtained from other investigators and witnesses.

15. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that possible crimes of distribution and possession with intent to distribute controlled substances; conspiracy to distribute and possess with the intent to distribute controlled substances; maintain drug involved premises; use of a communication facility in furtherance of a drug trafficking offense, violations of Title 21, United States Code, Sections 841, 843(b), 846, and 856, have been committed by Russell V. MCDADE (DOB XX/XX/1980), Samuel P. STAIR, a.k.a. "Sam STAIR", (DOB XX/XX/1974), Walter

RINGERSMA (DOB XX/XX/1965), and other identified and unidentified subjects. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## II. JURISDICTION

16. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## III. PROBABLE CAUSE

### A. Background

17. Since approximately May 2024, HSI, Drug Enforcement Agency (DEA), Wisconsin Department of Justice – Department of Criminal Investigation (DCI), the West Allis Police Department (WAPD) and other local agencies have been investigating a drug trafficking organization (DTO) on the southside of Milwaukee, Wisconsin that distributes fentanyl and cocaine. The DTO has been connected to several overdose deaths and appears to be led by Russell V. MCDADE (XX/XX/1980). Case agents have identified that Samuel STAIR allows drug trafficker MCDADE to operator "trap houses" out of STAIR's properties for a profit.

18. As part of the investigation, case agents have reviewed numerous recorded jail calls with in custody inmates and MCDADE and record jail calls with in custody inmates and STAIR. Case agents have identified by MCDADE and STAIR by their voices, names and other facts shared in the recordings consistent with MCDADE and/or STAIR.

19. Case agents have identified numerous cellphone number used by MCDADE through the investigation. Case agents are aware, it if common for those engaged in drug trafficking to have multiple cellphones and to change cellphones often in order to evade law enforcement. Case agents have identified telephone numbers **414-514-3794** with **IMSI number: 310410405991915** (the "**Target Cell Phone 1**") and **414-439-7468** with **IMSI number: 310410406002606** (the **"Target Cell Phone 2"**) with listed subscriber unknown, whose service provider is Dish, as MCDADE's most recently numbers. Case agents have also identified **414-732-3682** (the **"Target Cell Phone 3"**), with listed subscriber Samual P. STAIR, and listed address of 11512 W. Woodside Dr, Hales Corners, WI, whose service provider is T-Mobile, as STAIR's telephone number.

20. As part of the investigation into MCDADE, case agents are aware, that MCDADE will often use/direct others to operator his drug trafficking and other criminal conduct in an attempt to separate himself from his crimes to evade law enforcement detection. MCDADE has a history of drug trafficking offenses and has also cooperated historically with law enforcement. MCDADE has used his past knowledge of cooperation to assist him in evading law enforcement, because he is aware of some of law enforcement's investigative techniques. This is further observed during the May 2025 controlled buy outlined below. Further, MCDADE has a history of attempting, multiple times, to voluntarily assist law enforcement; however, the attempts continue to appear to be MCDADE fishing for information regarding possible investigations into his own conduct, his associates' conduct and/or attempting to remove his competitors from the community.

21. MCDADE has the following criminal convictions:

a. Milwaukee County Case 1999CF3561, Battery, Use of a Dangerous Weapon and Misdemeanor Bail Jumping;
b. Milwaukee County Case 2001CF1176, False Imprisonment, Use of a Dangerous Weapon, Party to a Crime;
c. Milwaukee County Cas Number 2002CF4576, Possess with intent to Delivery Cocaine;
d. Milwaukee County Cas Number 2007CF5564, Possess with intent to Delivery Cocaine;
e. Milwaukee County Cas Number 2014CF837, Disorderly Conduct; and
f. Milwaukee County Cas Number 2017CF500, Manufacture/Deliver Heroin.

22. In March 2025, case agents were notified of a confidential source (CS-1) that was purchasing controlled substances from "Roro" using telephone number 414-595-2360, a previously used drug line of MCDADE. CS-1 made recorded calls to telephone number 414-595-2360 with the assistance of law enforcement to arrange the purchase of fentanyl from 1512 South 21st Street, Milwaukee, Wisconsin. Case agents reviewed these recorded calls and were able to recognize that the voice of "Roro" as MCDADE.

23. CS-1 has given information concerning individuals involved in illegal activities, which has been independently verified through this investigation. The information has been verified through controlled buys, video recordings obtained during the controlled buys, queries through law enforcement databases, and surveillance. CS-1 is cooperating with law enforcement for consideration on pending criminal drug charges in Forest County. CS-1 has had past arrests or convictions for felony drug offenses, felony family support offenses, felony and misdemeanor bodily harm offenses, resisting/obstruction, traffic offenses and noncriminal retail theft offenses. Further, during CS-1's cooperation, on May 30, 2025, CS-1 was re-arrested on drug offenses by

State Patrol in Outagamie County. This drug conducted was not at the direction of law enforcement and contrary to CS-1 cooperation agreement.

**B. Controlled Buys**

24. Based on training and experience, I know that a "controlled buy" is a law enforcement operation in which an informant, such as the CS-1, purchases drugs from a target at the direction of law enforcement. For the below outlined controlled buys, the operations were generally conducted using surveillance, usually audio and video taping equipment, and pre-recorded purchase money. When a CS was used, she/he was searched for contraband, weapons, and money before the operation. The CS was also wired with a concealed body recorder and/or a monitoring device. When the transaction was completed, the CS met cases agents at a pre-determined meet location and gave the purchased drugs and the recording/monitoring equipment to the case agents. The CS was again searched for contraband, weapons, and money and then interviewed by the case agents about the drug transaction. The information provided by a CS was confirmed on the recording/monitoring equipment. A sample of the suspected drugs was then field tested by the case agents for the presumptive presence of controlled substances and then placed in inventory pursuant to normal inventory procedures. Further, often the calls to the target by the CS, which were consensually recorded calls, were done under the direction and control of case agents and/or made in the presence of case agents.

**a. Controlled Buy March 27, 2025 at STAIR's Property / MCDADE's Trap Houses**

25. On March 27, 2025, CS-1 called "Ro" at the telephone number 414-595-2360 to arrange the controlled buy of fentanyl at 1512 South 21st Street, Milwaukee, Wisconsin. Case

agents conducted surveillance and observed CS-1 arrive and enter the 1512 South 21st Street, Milwaukee, Wisconsin.

26. Case agents reviewed City of Milwaukee Assessor website and determined 1512 South 21st Street, Milwaukee, Wisconsin was purchased by S2 Real Estate Group 3 LLC, with a listed address of 2925 West Lincoln Avenue, Milwaukee, Wisconsin on August 9, 2019. Case agents reviewed the State of Wisconsin Department of Financial Institutions Corporate Records[1] and observed that S2 Real Estate Group 3 LLC registered agent was "Sam Stair" and a listed address of 11512 W. Woodside Drive, Hales Corners, Wisconsin (Figure 1).

| | | | |
|---|---|---|---|
| S089296 | S2 REAL ESTATE GROUP 3 LLC<br>found: SAM STAIR<br>12 - Domestic Limited Liability Company | 09/21/2010 | Restored to Good Standing<br>07/23/2025 |

(Figure 1)

27. Case agents are aware that STAIR resides at 11512 W. Woodside Drive, Hales Corners, Wisconsin. Further, as part of the investigation, case agents are aware that STAIR's is the owner of S2 Real Estate which is located at 2925 West Lincoln Avenue, Milwaukee, Wisconsin (Figure 2).

[1] https://apps.dfi.wi.gov/apps/corpsearch/Advanced.aspx




(Figure 2)

28. Once inside 1512 South 21st Street, Milwaukee, Wisconsin, CS-1 observed “Ro”. CS-1 later explained that he/she provided “Ro” (MCDADE) with the buy money and MCDADE provided CS-1 with the suspected fentanyl. CS-1 stated that “Ro” then exited the residence.

29. Case agents observed MCDADE and Walter RINGERSMA, previously identified as part of the investigation in the DTO, exit 1512 South 21st Street, Milwaukee, Wisconsin. CS-1 also left the residence and met with case agents.

30. Case agents reviewed the audio/video recorder footage obtained by CS-1 and recorded surveillance during the controlled purchase. Case agents identified MCDADE’s voice

as the person CS-1 identified as "Ro" and MCDADE's voice was on the recording during the drug transaction with CS-1.[2]

31. The suspected fentanyl was brought back to the station where it was weighed, and field tested positive for fentanyl. The total weight was 4.03 grams.

32. CS-1 identified MCDADE as "Ro" using a booking photo.

**b. Controlled Buy May 20, 2025**

33. Following the controlled buy in March 2025, CI-1 indicated "Ro" (MCDADE) texted messaged CI-1 and stated there was a new drug line, 414-541-3794. CI-1 indicated it was not uncommon for "Ro" to change drug lines.

34. On May 20, 2025, case agents met with CS-1 and made recorded calls to the number 414-514-3794 for "Ro" to arrange the purchase of fentanyl from 1425 West Greenfield Avenue, Milwaukee, Wisconsin. Case agents reviewed these calls and was able to recognize that the voice of "Ro" is in fact MCDADE.

35. Case agents reviewed City of Milwaukee Assessor website and determined 1425 West Greenfield Avenue, Milwaukee, Wisconsin was purchased by S2 Real Estate Group 9 LLC, with a listed address of 11512 W. Woodside CT, Hales Corners, Wisconsin, STAIR's home address, on March 29, 2023. Case agents reviewed the State of Wisconsin Department of Financial Institutions Corporate Records and observed that S2 Real Estate Group 9 LLC registered agent was "Sam Stair" and a listed address of 11512 W. Woodside Drive, Hales Corners, Wisconsin (Figure 3).

[2] During the controlled buy the recording device was in CS-1 pocket, so the video did not actual capture the buy. However, the audio did capture the buy, which was consistent with the description provided by CS-1.

| | | | |
|---|---|---|---|
| S120881 | S2 REAL ESTATE GROUP 9 LLC<br>found: SAM STAIR<br>12 - Domestic Limited Liability Company | 11/21/2018 | Organized<br>11/21/2018 |

(Figure 3)

36. On May 20, 2025, case agents met with CS-1 in order to conduct a purchase of fentanyl from MCDADE.

37. Case agents searched the CS-1 and no money or contraband was found. TCS-1 placed a recorded call to “Ro” at the phone number 414-514-3794, in the presence of case agents. During the phone call, the CS-1 spoke with a male subject CS-1 knows as “Ro”. The CS-1 advised that they would meet with "Ro" at 1425 West Greenfield Avenue, Milwaukee, Wisconsin. CS-1 was provided with pre-recorded police buy money in the amount of $450 and a hidden video/audio recorders for the transaction. Case agents followed CS-1 near the meet location. CS-1 made no stops and did not interact with anyone after being searched and before arriving at the meet location.

38. Prior to the controlled purchase, case agents positioned themselves in the area 1425 West Greenfield Avenue, Milwaukee, Wisconsin to conduct surveillance. Case agents observed CS-1 enter the residence. Case agents recognized MCDADE's voice on the hidden recording during the time of the transaction. Hidden video during the transaction captured a black male matching the physicals of MCDADE wearing a grey sweatshirt and his hands packaging the suspected fentanyl for the sale (this is no video capturing his face and speaking to CS-1. The video then captured the CS-1 then exited the residence with the suspected fentanyl, which was observed by case agents also. Case agents then observed CS-1 walk to his/her vehicle. CS-1 was then followed to a meet location. CS-1 did not make any contact

with anyone after leaving 1425 West Greenfield Avenue and prior to meeting with case agents.

39. CS-1 stated he/she provided “Ro” with the pre-recorded buy money from the police and “Ro” provided him/her with the suspected fentanyl in return. CS-1 stated that “Ro” was the same individual that CS-1 purchased drugs from in the past.

40. CS-1 stated that while inside the residence there were numerous people present. CS-1 stated there were three males with pistols and extended magazine. CS-1 identified one of the males with a pistol as "Nephew", who he identified as Alberto L. Boffil (m/w, XX/XX/04) by DOT photo, a known associate to MCDADE from previous surveillance by case agents.

41. CS-1 identified "Ro" as MCDADE by a booking photo.

42. Case agents later reviewed the audio/video recorder footage obtained by CS-1 from the controlled purchase and identified “Ro” as the voice of MCDADE. Also, case agent heard on the hidden recording MCDADE make note of a Milwaukee Police Department (MPD) Squad car that passes through the alley running east and west behind 1425 West Greenfield Avenue. MCDADE calls for people inside the residence to conduct a perimeter of the area. MCDADE can also be heard, after providing the fentanyl to CS-1, asking CS-1 "Are you doing a controlled buy?"

43. The suspected fentanyl weighed 5.8 grams and tested positive for fentanyl.

**C. MCDADE and STAIR Connections**

44. Through this investigation it was learned that MCDADE was working with STAIR, under the guise of his company “S2 Real Estate” to engage in drug trafficking. This

information was first heard by case agents on recorded jail calls when MCDADE made mention of himself working for a real estate company. MCDADE is also implicated in having a relationship with a female (identified as "Jeanette") at the S2 Real Estate company in recorded jail calls.

45. Case agents review a recorded jail call from September 13, 2025 from inmate PIN of Johnny A. Bynum which called telephone number 414-839-2402, which was a number associated with McDade at the time. (606959777_162541_09-13-2024_13-33-04_1-414-839-2402_1522.mp3). Case agents also identified MCDADE by his voice and other facts shared in the recording consistent with MCDADE. During this call MCDADE answered the phone. The inmate and MCDADE had a short conversation about the fact that MCDADE has not been answering the phone. MCDADE stated that he works at a real estate job and asked that the caller try to reach him after 5 PM when he is not working.

46. Case agents review a recorded jail call from September 16, 2025 from inmate PIN of Stacey Berry which called telephone number 414-242-1766. Berry speaks with a female. This conversation begins with the female telling Berry that they are currently in "code black" and she is looking for "Pooh-Shiesty" masks for people to wear. They begin by speaking about working on a bar that was purchased by "Ro" and the long hours to fix it up. There is then a conversation about Berry getting money placed on Berry's books, they state that "Ro" is there but not able to put the money on the books yet, "Wally" has the money card. They then discuss the night Berry was arrested and that Berry should not have been there and gotten arrested. Eventually the conversation turns to a house that was recently lost by a female and Berry states, "So wait he's not fucking the bitch from S2 no more" and the female responds to Berry to "Shut up…Don't

say it on the phone no more". The female then clarifies that the house they are speaking of is not "one of those". The female also states that she told "Ro" that she thinks he is the fall guy for S2.

47. Case agents reviewed State of Wisconsin Department of Financial Institutions. Case agents observed that "Sam STAIR" is the listed Registered Agent of multiple the multiple variations of the listed "S2 REAL ESTATE LLC".

48. Case agents search "S2 Real Estate" which produced a list of 43 different LLC's that are associated with the name of "S2 Real Estate", with different variations. Many of the name including addresses of residences and buildings throughout the City of Milwaukee and the City of West Allis. In each case the "registered agent" of the LLC is listed as "SAM STAIR" or "SAMUEL STAIR". Further the office for the LLC is listed in all cases as: 11512 W WOODSIDE DR / HALES CORNERS, WI 53130. Case agents review law enforcement databases and observed that Samuel P. STAIR (m/w, DOB XX/XX/1974) is associated with the address of 11512 W Woodside Dr, Hales Corners, WI 53130. Further, case agents review Wisconsin Department of Transportation (DOT) records, which indicated Samuel P. STAIR's address is 11512 W Woodside Dr, Hales Corners, WI 53130.

49. On September 12, 2024, MCDADE was at Milwaukee Police Department (MPD) District Two and spoke with officers. MCDADE stated he knew the officers through "Jeanette" a property manager of S2 Real Estate, located at 2925 West Lincoln Avenue. MPD officers understood that MCDADE worked for S2 Real Estates in a maintenance capacity. MCDADE stated he was frustrated that police were continuing to "board up" residence, including the property 1927 South 6th Street (rear cottage), Milwaukee, Wisconsin. MCDADE stated he was going to "takeover" the lease for his sister-in-law. Case agents were aware that on September

10, 2024, MPD executed a drug state search warrant at 1927 South 6th Street (rear cottage), Milwaukee, Wisconsin.

50. Case agents also received information that provided to West Allis Detective Nick Stachula regarding STAIR and MCDADE's criminal connections.

51. On September 14, 2024, at approximately 12:21 a.m. Detective Nick Stachula received a text message from telephone number 414-391-8404. The message began with a video of a male who Detective Stachula knew to be MCDADE based on prior investigations. Case agents also reviewed the video and verified it was MCDADE. MCDADE was seated in front of a coffee table. On top of the coffee table were four or five different piles of off-white rocky substances, which based on training and experience appeared to be crack cocaine. Additionally, the video had two clear plastic baggies of powdered substances, one brownish and the other white, which based on my training and experience, would be consistent with brown heroin and white cocaine. The video also captured numerous stacks of US Currency as well as a digital scale. In the 12 second video, MCDADE is wearing a grey Adidas jogging suit with white stripes down the sides. MCDADE is holding a clear plastic baggie from which he produces suspected crack cocaine rock and places it onto the digital scale and states "10". A female voice is then heard saying: "it sucks man I got all this money in my tit". As the female states this she takes the scale out of view of the video and then as it comes back into the view of the video the crack cocaine on top of the scale is gone. The female's face is never visible in the video. The female's voice then states: "they are all waiting here". The video then depicts MCDADE is then visible back away from the table and shaking the rest of the suspected crack cocaine remaining in the clear plastic baggie to the bottom of the bag in his hands as the video ends.

52. This video is then followed by a text message from telephone number 414-391-8404 (the same number):

*"Dude is a liar he work for the Realestate company S2 on the south side they rent him any drug house he want in different drug addict name he getting fental from his cousin in Chicago got runnners running back and forth up north to nenah foundulac and camel port West Allis he got them carrying guns to protect him house on 21 pierce another house on 6 a block after mitchell and he just got a new on 18 lincoln they let him know before the house get raid it and he move to another one"*

53. At the time of these messages being sent Detective Stachula did not have telephone number 414-391-8404 saved in his phone and did not know who it was that sent these unsolicited messages. At 8:39 a.m. Detective Stachula replied, "Who Sent this to me?" The telephone number 414-391-8404 replied: "Tommie Cole". West Allis Police Department previously arrested Tommie Cole related to a drug offense (24-033949); however, Cole was not in custody at the time the messages were sent. Cole was also not cooperating with law enforcement for any consideration at the time the messages were sent.

**a. 712 South 21st Street Milwaukee, Wisconsin**

54. Case agents identified 712 South 21st Street, Milwaukee Wisconsin as an address associated with MCDADE. In August 2024, case agents were conducted surveillance of 712 South 21st Street, Milwaukee Wisconsin and above MCDADE make contact at the address.

55. Case agents conducted a search of the address of 712 South 21st Street, Milwaukee Wisconsin through Milwaukee City Assessor's website[3] and learned that the listed Property Owner is "S2 REAL ESTATE GROUP 6 LLC". Case agents reviewed the State of Wisconsin Department of Financial Institutions Corporate Records and observed that S2 Real Estate Group 6 LLC registered agent was "Sam Stair" and a listed address of 11512 W. Woodside Drive, Hales Corners, Wisconsin (Figure 4).

| | | | |
|---|---|---|---|
| S111057 | S2 REAL ESTATE GROUP 6, LLC<br>found: SAM STAIR<br>12 - Domestic Limited Liability Company | 09/06/2016 | Organized<br>09/06/2016 |

(Figure 4)

56. Case agents conducted surveillance during the month of September 2024 and observed boxes being moved out of 712 South 21st Street, Milwaukee Wisconsin. This was also consistent with record jail calls reviewed with MCDADE during the same time, in which MCDADE discussed a different location as a stash house.

**b. 1512 South 21st Street, Milwaukee, Wisconsin (MCDADE Trap House)**

57. Case agents identified 1512 South 21st Street, Milwaukee, Wisconsin as an address associated with MCDADE during the investigation. As previously noted, this property is owned by S2 Real Estate and connected to STAIR. Case agents also identified other connections between MCDADE and STAIR at this property.

58. On November 27, 2024 at approximately 10:30 a.m. case agents conducting video surveillance captured a Subaru bearing Wisconsin license plate AZD-9422 (Subaru) parked on the parking lot / drive way direct north of 1512 South 21st Street, Milwaukee, Wisconsin. Case

[3] https://itmdapps.milwaukee.gov/MyMilwaukeeHome/indexSidebarNew.jsp

agents also observed a Lexus bearing Wisconsin license plate ASG-8148 (Lexus) parked across the street to 1512 South 21st Street, Milwaukee, Wisconsin. Based on other surveillance during the investigation into MCDADE, case agents are aware that MCDADE has used the Lexus during the investigation.

59. Case agents reviewed Wisconsin DOT records which indicated the Subaru had a registered owner of "S2 Technologies" with address of 11512 W Woodside Dr., Hales Corners, WI 53130 (STAIR's address). Case agent conducted surveillance at S2 Real Estate, located at 2925 West Lincoln Avenue, Milwaukee, Wisconsin on this same day, November 27, 2024. Case agents observed a red Chevrolet Pickup Truck bearing Wisconsin license plate NL2718 (Chevrolet) running in the lot attached to the building and the male driver entering and exiting the building of S2 Real Estate. Case agents reviewed Wisconsin DOT records for the Chevrolet and determined that it had a registered owner of "S2 Technologies" with address of 11512 W Woodside Dr., Hales Corners, WI 53130 (STAIR's address), the same as the Subaru, parked at MCDADE's trap house.

60. As previous described, On March 27, 2025, a controlled buy from MCDADE was conducted at 1512 South 21st Street, Milwaukee, Wisconsin.

61. On August 6, 2025, case agents conducted surveillance in the area of 1512 South 21st Street, Milwaukee, Wisconsin from approximately 11:50 a.m. to 1:20 p.m. Case agents observed numerous people coming and going from 1512 South 21st Street, Milwaukee, Wisconsin. Some of the males and females seen walking in and out of 1512 South 21st Street, Milwaukee, Wisconsin were identified as known drug users and/or known to engage in prostitution.

62. For example, case agents are aware that just prior to STAIR's arrival as outlined below, a female identified as Tozi Grace Topbear left the residence of 1512 South 21st Street, Milwaukee, Wisconsin and entered a Tan / Biege Chevy Trax, bearing Wisconsin license plate, 738-PRM (Trax). Milwaukee County Sheriff's Office Deputy Christopher Bacon conducted a traffic stop on this vehicle (MCSO Cad # 25-142210) on the Trax and identified the driver as a Larry Harris and the female as Topbear. Topbear stated that she was a prostitute and she was the picked up by Harris to engage in sexual activities, but she had not yet engaged in anything. Harris stated to that he was giving a friend (Topbear) a ride to his home in Oak Creek and he did not know his friend's (Topbear's) name.

63. During surveillance, case agents also observed MCDADE and RINGERSMA at the residence at approximately 11:50 a.m.

64. At approximately 12:40 p.m. MCDADE was observed again interacting with a person from inside 1512 South 21st Street, Milwaukee, Wisconsin. Case agents observed MCDADE and the person walk together to the area of South 21 Street and West Orchard Street on the southeast corner. It appears that after they walk to the corner multiple people begin to walk the area in the manner consistent with checking the area for security concerns or law enforcement.[4] This perceived "check" of the area was observed immediately after the traffic stop on Harris's vehicle, which left the area of 1512 South 21st Street, Milwaukee, Wisconsin after picking up Topbear from inside 1512 South 21st Street, Milwaukee, Wisconsin.

65. Case agents then observed MCDADE enter 1512 South 21st Street, Milwaukee,

---

[4] This is consistent with the "perimeter check that occurred during the controlled by on May 20, 2025 at the address of 1425 West Greenfield Avenue, Milwaukee, Wisconsin. MCDADE called for a "perimeter check" of the immediate area due to a marked squad traveling through the area. This is described previously in the affidavit

Wisconsin. At approximately 12:55 p.m. case agents observed Sam STAIR exit a white Tesla bearing Wisconsin license plate, AEB-6163 (Tesla). STAIR walked into the front entrance of 1512 South 21st Street, Milwaukee, Wisconsin. At approximately 1:04 p.m. STAIR is observed exiting the residence. STAIR is speaking on the phone and then re-enters 1512 South 21st Street, Milwaukee, Wisconsin shortly after. At approximately 1:11 p.m. STAIR exits1512 South 21st Street, Milwaukee, Wisconsin holding a black bag in his right hand (Figures 5 and 6). STAIR speaks with MCDADE. Moments later STAIR enters his Tesla and leaves the area to the north. At 2:05 p.m., STAIR is seen at the 1425 West Greenfield Avenue, Milwaukee, Wisconsin, further described below.



(Figure 5)



(Figure 6)

**c. 1425 West Greenfield Avenue, Milwaukee, Wisconsin**

66. Case agents identified 1425 West Greenfield Ave, Milwaukee, Wisconsin as an address associated with MCDADE during the investigation, specifically a trap house being used by MCDADE. As previously noted, this property is owned by S2 Real Estate and connected to

STAIR.

67. As previous mentioned in this affidavit there was a controlled buy from the address of 1425 West Greenfield Ave, Milwaukee, Wisconsin.

68. On Wednesday August 6, 2025, at approximately 2:05 p.m., STAIR is seen at the 1425 West Greenfield Avenue, Milwaukee, Wisconsin. STAIR appeared to be speaking with a Maintenance worker working on the front porch at the address. At approximately 2:22 p.m. STAIR's Tesla is then observed back at the S2 Real Estate Building, 2925 West Lincoln Avenue, Milwaukee, Wisconsin parked in the rear lot.

**D. DRUG CONNECTION STAIR and MCDADE**

69. On August 12, 2025, case agents met with CS-2 to speak about information concerning S2 Real Estate, STAIR and MCDADE.

70. CS-2 has given information concerning individuals involved in illegal activities, which has been independently verified through this investigation and other investigations. The information has been verified through queries through law enforcement databases, and surveillance. CS-2 has had past convictions for felony robbery, drug, and firearm offenses. CS-2 has no prior arrests or convictions related to dishonesty. CS-2 was cooperating with law enforcement for third-party consideration on behalf of a family member in a pending federal tax investigation. As of, CS-2 is now cooperating with law enforcement in exchange for monetary consideration. As of today's date, CS-2 has not received any fund for his cooperation.

71. In July 2025, STAIR provided CS-2 a $10,000 loan. CS-2 has been making payments to STAIR for that loan. STAIR currently has the title of CS-2's property as collateral for the loan. CS -2 is not behind in any payments to STAIR.

72. CS-2 explained that MCDADE is a known employee of S2 Real Estate located at 2925 West Lincoln Avenue, Milwaukee, Wisconsin.

73. CS-2 knows that MCDADE and the owner of S2 Real Estate, "Sam" STAIR have known each other for approximately 4-5 years.

74. CS-2 was able to recall an interaction from approximately 4 years prior wherein CS-2 witnessed STAIR communicating with MCDADE concerning a drug transaction. CS-2 stated that STAIR shared with CS-2 that MCDADE asked STAIR for between $20,000 to $30,000 to purchase a kilogram of cocaine. CS-2 stated STAIR was known to use cocaine recreationally, but this was the first time the CS-2 knew of STAIR financing drug dealing.

75. CS-2 explained that MCDADE was known as a "security employee" for S2 Real Estate. CS-2 stated that what MCDADE really does is use S2 Real Estate buildings to run drug and prostitution operations.

76. CS-2 stated STAIR has requested that CS-2 make pick-ups of packages from these trap houses and deliver them to STAIR's home residence in Hales Corner, Wisconsin. CS-2 stated that in the past 30 days STAIR asked the CS-2 to pick up an item from MCDADE at 1512 South 21 Street, Milwaukee, Wisconsin, which was concealed in an insulated pizza container. The CS-2 believed that the container was too heavy for pizza and was consistent with being money and/or drugs. The CS-2 was asked not to inspect such deliveries by STAIR and delivered this package to STAIR who was at his home in Hales Corner, Wisconsin.

77. In a follow up interview with CS-2, CS-2 stated that STAIR paid CS-2 $2,000 cash just prior to the delivery as a payment for the task. Based on my training and experience, this large amount of payment for a simple delivery of a package, would be consistent with the

package containing items connected to illegal drug trafficking. For example, the risk of being caught with a large amount to illegal controlled substances or illegally obtained drug proceeds would likely make individuals unwilling to assist in delivering such packages. In order to make the risk worth it, drug traffickers will often provide compensation to drug carriers/drug proceed carriers and also ensure those individuals to not steal from the drug traffickers.

78. CS-2 stated STAIR discussed concerns regarding security camera not operating correctly for MCDADE at 1425 West Greenfield Avenue, Milwaukee, Wisconsin.

79. CS-2 was asked by STAIR within the last month to go to the address of 1425 West Greenfield Avenue, Milwaukee, Wisconsin.

80. CS-2 traveled to 1425 West Greenfield Avenue, Milwaukee, Wisconsin and entered through the front door. The CS-2 stated that from the front door one enters into the front sitting room area. The CS-2 observed in this front sitting room area approximately six males all with semiautomatic firearms and extended magazines hanging from their pockets.

81. CS-2 example that this room opens into the kitchen area, where CS-2 observed two females seated at a table and MCDADE standing at the table. CS-2 stated MCDADE had an assault style rifle leaning against the wall next to him and approximately another six other males all armed in the same manner as the front room standing about. In the kitchen area the CS-2 observed MCDADE with approximately 250 grams of cocaine. CS-2 observed MCDADE appeared to be in the process of cooking the 250 grams of cocaine in the microwave to make crack cocaine. The CS-2 observed a two Quart Pyrex measuring cup with baking soda and water. The CS-2 was able to smell the substance in the microwave and was able to see and smell that the substance was cocaine. The CS-2 described one of the females at the table as being close to

MCDADE (possibly romantically involved) due to the manner that they interacted and was described as a brown skinned Puerto Rican female. The other female at the table was described as a heavier set and light skinned. The CS also observed a rear room where there was located maybe as many 15 people, most female, approximately three where actively smoking from glass crack cocaine pipes. The CS believed there was rear access to the residence from this room and costumers were brought to this room through the rear door. The CS-2 observed some were armed as well.

82. The CS-2 observed cameras in the rear pantry style room off the kitchen. This room consisted of a large approximately 50 inch TV with multiple camera screens playing live views. There was a mouse attached to the system which the CS-2 believed was a hard drive system. The CS-2 believed there were approximately 15 cameras playing on the screen and appeared to capture the entire block was visible. CS explained that these were the cameras that STAIR discussed needing to be fixed for MCDADE. The CS-2 described there was a person sitting monitoring this screen and that it appeared that the person was assigned with this task. Based on training and experience, the security system established at 1425 West Greenfield Avenue, Milwaukee, Wisconsin, described by CS-2, in which STAIR indicated did not operate correctly, is set up in a way to protect a drug stash house, not a residential home being rented out for legit means.

83. CS-2 stated when leaving 1425 West Greenfield Avenue, Milwaukee, Wisconsin, CS-2 was escorted to CS-2's car, which was parked about a block away. CS-2's escort was an armed individual from inside the residence of 1425 West Greenfield Avenue, Milwaukee, Wisconsin. The CS-2 was escorted all the way to CS2's car and then got into CS-2's car. CS-2

then drove the escort back to 1425 West Greenfield Avenue, Milwaukee, Wisconsin, and then left the area.

84. CS-2 knows Russell MCDADE by the nickname of "Ro" and knows "Ro" to use the phone number of 414-439-7468 and Sam STAIR to use **414-732-3682 (Target Cell Phone 3).**

85. CS-2 further explained that STAIR appeared to be obtaining money from MCDADE for allowing MCDADE to run stash houses at S2 properties.

### E. Jail Calls with STAIR's Telephone Number 414-732-3682 (Target Cell Phone 3)

86. Case agents reviewed recorded jail calls to STAIR's telephone **414-732-3682 (Target Cell Phone 3)** and found that there was a consistent caller, believed to be William Meeuwsen who is convicted of First-Degree Reckless Homicide, Deliver Drugs, Kewaunee County Case Number 2020CF63. Case agents reviewed all the calls from May 30, 2025 through July 26, 2025 and found five recorded jail calls from two different facilities, four from the PIN of William Meeuwsen at Jackson Correctional Institute and one from the PIN for Michael Froncek at Winnebago Correctional Institute. During one record jail call, STAIR and the inmate discusses a business plan of renting properties to drug traffickers, but appears to brush it off like a joke.

87. In review of the recordings, case agents believe all the calls were answered by the same male voice, which case agents knows to be STAIR's voice from review of other interviews of STAIR's with the media.[5] Further, other matters discussed during the calls are consistent with

[5] "$7M in rental assistance available for those in 3 counties as public housing eviction ban set to expire July 25, Published on July 9,

STAIR, including the callers referring to him as "Sam" and discussion regarding his rentals/collection of rent.

88. In a recorded jail call, 752102557_117744_07-08-2025_17-50-26_1-414-732-3682_93466, between the PIN of William Meeuwsen and STAIR's telephone **414-732-3682 (Target Cell Phone 3)**, the caller (inmate) and STAIR discuss how STAIR is working to place inmates in his properties as a halfway house. STAIR discussed how the inmates would come out of jail, and he would use the rooming house for the inmates and inmates engaged in rehab.

**Inmate**: Not to mention Sam, you know what happens, but all that money, all that money, that state money, you can double bubble all day long in there. You know.

**STAIR**: Oh yeah, yeah.

**Inmate**: Oh hell yeah. I mean, I don't know what you are getting now, but... you can..

**STAIR**: Oh yea, that would be nice. I mean, the guys in there now are so bad. Like, we are pretty empty, because, you know, it used to be just drunks and regular folks, and now its the heroin addicts and they just, you know.

**Inmate**: Oh, they fold over and fall down. Yep.

**STAIR**: Yep. They don't pay a thing. They'll bring in 10 people. They, you know, constantly kicking them out. They can't seem to, you know, make their payment. They get their money and owe their dealer too much. I don't know what it is, but.

**Inmate**: (Laughing) No don't. I was going to say, you're better off getting the dealer to move in (laughing) and work through him. (laughing).

**STAIR:** I know (laughing).

**Inmate:** That's crazy (laughing). That's crazy (laughing). I got an idea. Let's find a couple guys. Let's find a couple guys and make them a dealer. (laughing).

**STAIR**: Yeah (laughing).

**Inmate**: No. Let's not.

**STAIR**: Wouldn't regret it. (laughing). Just kidding.

**Inmate**: Exactly. (Laughing). That's crazy though.

**STAIR**: You almost, you almost think someone would do that. You know, set up.

**Inmate**: You know.

**STAIR**: But I bet, I bet they have the same problem where they can't collect either, so.. (the call continued).

---

2020, https://www.fox6now.com/news/7m-in-rental-assistance-available-for-those-in-3-counties-as-public-housing-eviction-ban-set-to-expire-july-25 (view August 16, 2025).

### F. Identification STAIR's Telephone Number 414-732-3682 (Target Cell Phone 3)

89. Case agents reviewed database searches and learned that the phone number associated with STAIR was **414-732-3682 (Target Cell Phone 3)**. This is also the number listed for STAIR in Law Enforcement contacts such as West Milwaukee Police Department Activity # 23-002909 (building owner) of 5101 West National Avenue, West Milwaukee, Wisconsin from April 27, 2023.

90. Case agents are aware that MPD were in contact with STAIR regarding nuisance property at 1934 West Greenfield Avenue, Milwaukee, Wisconsin. On July 13, 2025, MPD officers from the District Two Community Partnership Unit obtained information regarding the property manager of 1934 West Greenfield Avenue, Milwaukee, Wisconsin, who was identified as "Sam STAIR", based on prior contacts. MPS attempted to reach the management company regarding the nuisance property.

91. On July 28, 2025 MPD conducted a check of an alleged vacant property at 1934 West Greenfield Avenue, Milwaukee, Wisconsin. MPD conducted the check due to numerous complaints regarding the property being frequented by transients, drug users, prostitutes and is adjacent to several suspected drug houses. The property has become a nuisance in the community. MPD officers observed several individuals sitting on the west steps of 1934 West Greenfield Avenue, under the posted "No Trespassing" sign. Officers spoke with several individuals, including a black male (captured on body camera) who was wearing a pair of binoculars around his neck. The black male declined to explain why he was wearing binoculars. The black male told officers he had permission to be at location, from the property owner "Sam".

The black male called "Sam" and handed officer the phone. The caller identified himself as Samuel P. STAIR and the manager of the property of 1934 West Greenfield Avenue. Officers observed the number dialed for STAIR was **414-732-3682 (Target Cell Phone 3)**.

92. STAIR explained to officers that no one was supposed to be trespassing on the property. STAIR stated he "hired" an individual by the name of "RUSSEL MCCARTHY" to be security and keep people away, as well as to find a tenant for the location.

93. MPD Officers, reviewed records and observed prior contacts with a Samuel P STAIR, DOB: XX/XX/1974, for telephone number **414-732-3682 (Target Cell Phone 3)**.

94. On July 29, 2025, MPD officers sent an email to maintenance@s2support.com and addressed it to "Sam" as a follow-up to previous contact. Case agents were informed that no reply has been received yet.

**H. Historical Call Detail Records**

95. Case agents have reviewed the call records of MCDADE's prior telephone numbers 414-514-3794 and 414-439-7468. Case agents observed that between the dates of May 1, 2025 and August 12, 2025 there were 87 communications total between STAIR's telephone number **414-732-3682 (Target Cell Phone 3)** and 414-514-3794 and 414-439-7468. There were (84) communications between STAIR's telephone **414-732-3682 (Target Cell Phone 3)** and MCDADE's prior telephone 414-439-7468. There were three communications between STAIR's telephone number **414-732-3682 (Target Cell Phone 3)** and MCDADE's prior telephone number 414-514-3794.

96. Case agents continued to monitor court authorized electronic surveillance of MCDADE's prior telephone numbers 414-514-3794 and 414-439-7468 and STAIR's telephone

**414-732-3682 (Target Cell Phone 3).** Case agents observed that MCDADE's telephone 414-514-3794 began to show a loss of service and 414-439-7468 was showing information that was outside the normal pattern of locations and calls. Case agent also observed STAIR's telephone **414-732-3682 (Target Cell Phone 3)** was no longer the frequent contact with MCDADE's phones. Based on this information and MCDADE's historical pattern of changing telephone numbers to evade law enforcement detection when engaged in drug trafficking and other illegal activities, case agents then began to attempt to identify possible new telephone numbers for MCDADE.

### I. Surveillance of MCDADE's Stash House Owned by STAIR Located at 1425 West Greenfield Avenue

97. Case agents have continued to conduct physical and electronic surveillance, since court authorized electronic surveillance of the MCDADE'S prior telephone numbers 414-514-3794 and 414-439-7468. Information obtained, has been consistent with MCDADE engaged in ongoing drug trafficking and using 414-514-3794 and 414-439-7468**.** Information obtained from the court authorized electronic surveillance has assisted case agents in identify co-conspirators, possible drug sources, and additional locations connected to the drug trafficking organization and MCDADE.

98. Case agents have review court authorized electronic surveillance of the 414-514-3794 and 414-439-7468 several trends from 414-514-3794 and 414-439-7468.

99. First, 414-514-3794 and 414-439-7468 appeared to generally travel in a pattern consistent with MCDADE's former telephones likely being possessed together. Further, case agents have observed that between July 1, 2025 and August 12, 2025, that the 414-514-3794

and 414-439-7468 were commonly and consistently are located near the 1400 block of West Greenfield Avenue. This is a location where the 414-514-3794 and 414-439-7468 appeared to be on nearly a daily basis, the phones appear communicating with towers in the area of 1425 West Greenfield Avenue, Milwaukee, Wisconsin every day from July 1, 2025 to August 12, 2025; except for July 7, 2025 and July 9, 2025.

100. Case agents have also observed MCDADE in this area, specifically at 1425 West Greenfield Avenue, Milwaukee, Wisconsin.

101. On July 15, 2025 at approximately 9:10 a.m., case agents were conducting surveillance in the area of 1425 West Greenfield Avenue, Milwaukee, Wisconsin. Case agent observed a white female wearing a nursing style shirt with blond hair exit a white Toyota Camry, bearing Wisconsin license plate AUZ-7907 (Camry). The Camry was parked in front of the address of 1425 West Greenfield Avenue, Milwaukee, Wisconsin. The unknown female walked into the east gate area of the residence 1425 West Greenfield Avenue, Milwaukee, Wisconsin. Followed after her is a male in a blue boonie hat that has been captured numerous times in video entering and exiting the front door of 1425 West Greenfield Avenue, Milwaukee, Wisconsin in the past weeks. Parked directly in front of the Camry is a black Saab Station Wagon, bearing Wisconsin license plate BAZ-8829 (Saab). Case agents review Wisconsin DOT records which indicated the license plate was registered to Travean Brookshire, DOB XX/XX/1982, with a listed address of 1512 South 21st Street, Milwaukee, Wisconsin,[6] which was updated on January 26, 2025 with DOT.

102. Moments later a different female wearing a blue and red jacket and camouflage

[6] As previously noted, this property is owned by S2 Real Estate Group 3 LLC, with a registered agent as Sam STAIR.

pants is observed exiting 1425 West Greenfield Avenue, Milwaukee, Wisconsin. Approximately 2 minutes later the male with the boonie hat exited the east side gate of 1425 West Greenfield Avenue, Milwaukee, Wisconsin and walked out of view to the north, crossing the street.

103. At approximately 9:13 AM a black male with no shirt and a backpack came out of the front door of 1425 West Greenfield Avenue, Milwaukee, Wisconsin and walked to a Chevy SUV, bearing Wisconsin license plate BAH-8297 (Chevy) and stood at the passenger side in a manner as though interacting with persons inside the Chevy.

104. At approximately 9:15 AM the same black male with no shirt walks back to the front door of 1425 West Greenfield Avenue, Milwaukee, Wisconsin and knocks at the door of 1425 West Greenfield Avenue, Milwaukee, Wisconsin. Moments after the male with no shirt begins to knock at the door three individuals emerge from the Chevy and walk to the front door of 1425 West Greenfield Avenue, Milwaukee, Wisconsin. Case agents identified one of the males as MCDADE, one as a black male with the boonie hat and the third as a white male in a maroon Champs t-shirt (Figure 7).



(Figure 7)

105. Case agents observed MCDADE walk onto the porch area of 1425 West

Greenfield Avenue, Milwaukee, Wisconsin. Case agents observed MCDADE was carrying a firearm, with what appeared to be an extended magazine under his left arm (Figures 8, 9 and 10 / circle in red). Case agents conducting surveillance also observed MCDADE manipulating what appeared to be two cell phones in his hands (Figures 8 and 9 /circle in blue).



(Figure 8)



(Figure 9)



(Figure 10)

106. Case agents review court authorized electronic surveillance for this same time period. Case agents observed that 414-514-3794 and 414-439-7468 appeared to be communicating with towers near the area South 14th Street and West Greenfield Avenue. This would be consistent with MCDADE being in possession with 414-514-3794 and 414-439-7468 1425 West Greenfield Avenue, Milwaukee, Wisconsin. Case agents then observed MCDADE and the other two males enter 1425 West Greenfield Avenue, Milwaukee, Wisconsin.

107. At approximately 9:16 a.m. the white female in the nurse scrubs shirt leaves the side gate of 1425 West Greenfield Avenue, Milwaukee, Wisconsin and enters the Camry and leaves eastbound on West Greenfield Avenue. Based on training and experience, I am aware that this short, contact with 1425 West Greenfield Avenue, Milwaukee, Wisconsin, a known location in which MCDADE has engaged in drug trafficking in the past, would be consistent

with a drug transaction.

### J. Review of Jail Calls to MCDADE's Prior Telephone Numbers 414-514-3794 and 414-439-7468

108. Case agents reviewed numerous jails calls between inmates and MCDADE using his prior telephone number 414-514-3794 and 414-439-7468 including calls from Amber Valadez, Stacey Berry[7], and Marvin Sanders. During call these calls, case agent identified the male caller using 414-514-3794 to be MCDADE, by his voice, his name and other facts shared in the recordings consistent with MCDADE.

- (730849047_553878_05-22-2025_07-35-38_1-414-514-3794_8512) – From ID: Amber Valadez;
- (731052329_487029_05-22-2025_16-02-15_1-414-514-3794_4921) – From ID: Stacey Berry;
- (731289289_553878_05-23-2025_07-28-46_1-414-514-3794_12502) – From ID: Amber Valadez;
- (731326017_553878_05-23-2025_09-33-53_1-414-514-3794_12502) - From ID: Amber Valadez;
- (732366901_487029_05-25-2025_13-04-27_1-414-514-3794_4905) – From ID: Stacey Berry;
- (732719459_487029_05-26-2025_09-33-13_1-414-514-3794_4921) – From ID: Stacey Berry;
- (733706051_553878_05-28-2025_16-24-08_1-414-514-3794_8512) – From ID: Amber Valadez;
- (733890807_553878_05-29-2025_07-22-38_1-414-514-3794_8509) – From ID: Amber Valadez;
- (733941167_487029_05-29-2025_10-03-05_1-414-514-3794_4905) – From ID: Stacey Berry; and
- (733958981_487029_05-29-2025_10-42-46_1-414-514-3794_4921) – From ID: Stacey Berry.
- -(745376051_487029_06-24-2025_07-48-24_1-414-514-3794_4910) – Call on June 24, 2025 from PIN of Stacey Berry. The call is answered by MCDADE[8];
- -(745383229_420734_06-24-2025_08-13-20_1-414-514-3794_7413) – Call on June 24, 2025 from PIN of Gail McCurry. The call is answered by MCDADE;

---

[7] June 24, 2025 Stacey Berry was released from custody.

[8] Stacey Berry was released from custody this same day from the Milwaukee Women's Correctional Center. Based on surveillance, Berry appeared to be residing at MCDADE's stash houses located at 1425 West Greenfield Avenue, Milwaukee, Wisconsin and 1512 South 21st Street, Milwaukee, Wisconsin.

- -(745662931_420734_06-24-2025_18-34-15_1-414-514-3794_7416) – Call on June 24, 2025 from PIN of Gail McCurry. The call is answered by MCDADE. The called appeared to then be handed Berry, who case agents knew was now out of custody and recognized by her voice from prior record calls;
- -(745873835_420734_06-25-2025_11-10-36_1-414-514-3794_7416) – Call on June 25, 2025 from PIN of Gail McCurry. The call is answered by MCDADE. The called appeared to then be handed Berry, who case agents recognized by her voice from prior record calls;
- -(746213197_553878_06-26-2025_07-19-46_1-414-514-3794_4901) – Call on June 26, 2025 from PIN of Amber Valadez. The call is answered by MCDADE and he speaks with her throughout the call;
- -(746354983_553878_06-26-2025_14-13-14_1-414-514-3794_4901) – Call on June 26, 2025 from PIN of Amber Valadez. The call is answered by MCDADE. The called appeared to then be handed Berry, who case agents recognized by her voice from prior record calls;
- -(746660199_553878_06-27-2025_08-28-44_1-414-514-3794_4909) – Call on June 27, 2025 from PIN of Amber Valadez. The call is answered MCDADE and he speaks with her throughout the call.
- -Call from DOC Inmate ID Laporte on July 10, 2025 at 22:49 hrs (753189669_669377_07-10-2025_22-49-19_1-414-514-3794_50497);
- -Call from DOC Inmate ID Valadez on July 11, 2025 at 8:37 hrs (753224183_553878_07-11-2025_08-37-55_1-414-514-3794_4910);
- -Call from DOC Inmate ID Harrison on July 16, 2025 at 9:58 hrs (755535689_534722_07-16-2025_09-58-06_1-414-514-3794_3407);
- -Call from DOC Inmate ID Valadez on July 26, 2025 at 9:11 hrs (759975563_553878_07-26-2025_09-11-58_1-414-514-3794_4911);
- -Call from DOC Inmate ID Valadez on July 28, 2025 at 8:49 hrs (760926047_553878_07-28-2025_08-49-08_1-414-514-3794_4909)
- -(741989801_546247_06-16-2025_12-07-13_1-414-439-7468_97028) – Call on June 16, 2025 from PIN of Marvin Sanders. The call is answered MCDADE and he speaks throughout the call;
- -(743853967_546247_06-20-2025_22-16-16_1-414-439-7468_97028) – Call on June 16, 2025 from PIN of Marvin Sanders. The call is answered by MCDADE and he speaks throughout the call; and
- - (753761603_546247_07-12-2025_12-03-18_1-414-439-7468_97028) – Call on July 12, 2025 at 12:03 pm from PIN of Marvin Sanders.

109. Further, based on review of previously jails calls, both Amber Valadez and Stacey Berry have been consistent contacts with MCDADE in the past and case agents recognized Amber Valadez and Stacey Berry voices and other content which they discuss

during the record calls.

### K. Identification of MCDADE's New Telephone 414-460-9608 (Target Cell Phone 1) Review of Jail Call

110. Case agents continued to reviewed jails calls between inmates known to communicate with MCDADE in an attempt to identify possible new numbers MCDADE was using. Case agents reviewed frequent callers to inmate Amber Valadez and identified a new telephone contact number of **414-460-9608 (Target Cell Phone 1).** Case agents reviewed the following recorded jail calls between **414-460-9608 (Target Cell Phone 1)** and Amber Valadez and immediately recognized that **414-460-9608 (Target Cell Phone 1)** was consistently answered by the voice identified by case agents as MCDADE based on review of numerous other record jail calls and the investigation, except the last call when a female answered the phone for him:

- 764813267_553878_August 5, 2025_18-15-15_1-414-460-9608_55458;
- 777569193_553878_September 1, 2025_19-21-58_1-414-460-9608_55458;
- 777629439_553878_ September 1, 2025_20-36-02_1-414-460-9608_55458;
- 777731359_553878_ September 02, 2025_09-12-11_1-414-460-9608_55458;
- 777968039_553878_ September 02, 2025_18-00-22_1-414-460-9608_55458;
- 778188713_553878_ September 03, 2025_07-58-25_1-414-460-9608_55458;
- 778661933_553878_ September 04, 2025_08-02-56_1-414-460-9608_55458;
- 779023491_553878_ September 04, 2025_19-59-37_1-414-460-9608_55458;
- 779172575_553878_ September 05, 2025_09-10-03_1-414-460-9608_55458;
- 779759527_553878_ September 06, 2025_10-20-18_1-414-460-9608_55458;
- 780425623_553878_ September 07, 2025_12-23-08_1-414-460-9608_55458;
- 780614239_553878_ September 07, 2025_17-51-28_1-414-460-9608_55458;
- 780747309_553878_ September 07, 2025_20-18-55_1-414-460-9608_55458;
- 781371919_553878_ September 09, 2025_09-28-19_1-414-460-9608_4901;
- 780880281_553878_ September 08, 2025_09-32-59_1-414-460-9608_55458;
- 782922075_553878_ September 12, 2025_08-57-18_1-414-460-9608_4901;
- 787876817_553878_ September 20, 2025_10-31-06_1-414-460-9608_4901;
- 788223889_553878_ September 20, 2025_19-47-20_1-414-460-9608_55458; and
- 788824665_553878_September 21, 2025_20-08-45_1-414-460-9608_55458 (answered by female).

111. While reviewing these recorded jail calls between Amber Valadez and MCDADE's new telephone number **414-460-9608 (Target Cell Phone 1)**, case agents observed that MCDADE spoke of "Stacey", who case agents know from previous investigation to be Stacey BERRY.

112. During recorded jail call between Amber VALDEZ's PIN and MCDADE's telephone number **414-460-9608 (Target Cell Phone 1)** (787876817_553878_09-20-2025_10-31-06_1-414-460-9608_4901) MCDAD. states that he is busy and are moving the house up the street. MCDADE states that "these mother fuckers did 10,000 last night, I fell asleep they went nuts…". At approximately 12 minutes into the recording of the call MCDADE states to someone "I got boy on the way". Case agents know from training and experience "boy" is used to reference heroin and other opioids by drug dealers and "girl" is referred to cocaine. Case agents are also aware based on the investigation into the DTO, that MCDADE often uses multiple drug houses to engage in drug trafficking in an attempt to evade law enforcement.

113. During the final call from Amber VALDEZ's PIN to MCDADE's telephone **414-460-9608 (Target Cell Phone 1)** (788824665_553878_09-21-2025_20-08-45_1-414-460-9608_55458), case agents heard a female answer the phone and identify herself as "Lowlee". "Lowlee" states that she is "Ro's girlfriend". "Lowlee" states that Ro is on porch and she begins to speak to VALADEZ about her relationship with "Ro". The call ends with "Lowlee" confronting an individual that sounded like MCDADE about him still speak with VALDEZ and the call abruptly ends.

**L. Identification of MCDADE's New Telephone 414-243-1392 (Target Cell**

**Phone 2) Review of Jail Call**

114. Case agents also reviewed recorded jail calls from Russell McDade Jr.'s PIN. Case agents were aware that McDade JR was arrested in August 2025 related to drug and firearm offenses and charged in Milwaukee County Case 2025CF3849.

115. Case agents reviewed a recorded jail call between McDade Jr's PIN and telephone 414-242-8847 on September 11, 2025 at approximately 12:33 PM (736903624_2025014529_09-11-2025_12-33-40_1-414-242-8847_11102.mp3). Case agents reviewed law enforcement databases and believe telephone 414-242-8847 is used by Shirtreal Roby, who is believed to be the biological mother to McDade Jr based on the content of the calls with this number. During the beginning of the call I noted that it appeared the female as she answered the phone was giving a number to someone to attempt to call – this number can be heard as she appears to call it out to the someone nearby, **414-243-1392 (Target Cell Phone 2)**. During this call the female answering the phone and states to McDade Jr that she is trying to call his father and he is not answering, The female adds that he (McDade Jr's father) is acting weird. At approximately 5 minutes and 22 seconds into the recording there appears to be a second phone ring and the female appears to pick it up. The female states that she has Junior on "loud speaker" and case agents can hear the voice of MCDADE (Sr.) stating "tell him don't say nothing out of order please". McDade Jr. states that he needs his (MCDADE (Sr.)) numbers and he wishes to speak with him (MCDADE (Sr.)). MCDADE (Sr.) does not reply and the call ends shortly after with McDade Jr. stating "Don't worry about it". Case agents recognize MCDADE (Sr.) voice on this record call based on review of other record jail calls and the investigation into MCDADE (Sr.).

116. Case agents reviewed a recorded jail call between McDade Jr's PIN and telephone

414-242-8847 (Shirtreal Roby) from September 13, 2025 at approximately 1:06 PM (737016250_2025014529_09-13-2025_13-06-11_1-414-242-8847_12102). During this call McDade Jr. calls Roby "Mom" and they speak at length about McDade Jr.'s father not providing a phone number for McDade Jr. to speak to him (MCDADE Sr.). At the beginning of the call Roby states that McDade Jr.'s father is calling on the other line and she states she is going to merge the calls. Case agents can hear a male voice, which case agents recognized as MCDADE Sr. based on review of other jail calls and the investigation. MCDADE Sr. addressed McDade Jr. as "Junior". MCDADE Sr. states that he has not spoken with McDade Jr. because people are listening to McDade Jr.'s calls. MCDADE Sr. later tells McDade Jr. that he will give McDade Jr.'s mother a phone number for McDade Jr. to reach MCDADE Sr. at in the following days. McDade Jr. is upset that his father is not more supportive and explains to him that this is part of his life style to be locked up and he needs a number to contact his father.

117. Case agents reviewed a recorded jail call between McDade Jr's PIN and telephone 414-242-8847 (Shirtreal Roby) from September 14, -2025 at approximately 3:56 PM (737077276_2025014529_09-14-2025_15-56-45_1-414-242-8847_14102). Roby answers the phone and speaks to McDade Jr. about the fact that his little brother went to Wisconsin Dells. They discuss that it is difficult to speak with his father again. Roby asks if McDade Jr. want to have her merge a call. McDade Jr. states yes and after a short pause, case agents hear a male voice, which they recognize to be MCDADE Sr. based on review of other recorded jail calls on the investigation. MCDADE states that he does not have a phone at this time because he does not have the correct SIM card. MCDADE Sr. gives to McDade Jr the number of 414-640-1926 to contact MCDADE Sr. through, which appears to actually be "Jay's" number. MCDADE Sr.

states that he doesn't want his son to speak so much on this phone. McDade Jr. states "these people ain't worried about me", indicating McDade Jr.'s belief that law enforcement are not listening into his recorded jail calls. McDade Jr. addresses his father as "Pops' during this call and also speaks to him about spending time with his little brother. MCDADE Sr. becomes upset about this admonition from his son and tells McDade Jr. to call him on "Jays" number. McDade Jr. and his mother then remain on the phone and speak about being upset with MCDADE Sr. and his lack of communication. McDade Jr. states: "them houses gonna get nailed he gonna keep playing". Based on the investigation into the DTO, case agent believe this statement is a reference to MCDADE Sr.'s drug house. Roby then states that she has a video on her phone right now "that is so crucial, so critical". McDade Jr. speaks more about his feeling of being used like "a pawn". Based on the investigation into the DTO with would be consistent with how MCDADE Sr. has other individuals dealer controlled substances and control the drug houses on his behalf in order to isolate himself from law enforcement.

118. Case agents reviewed other record jail calls made to MCDADE's new telephone number **414-243-1392 (Target Cell Phone 2)** including from inmate Randy Roman Olson PIN at Drug Abuse Correctional Center on August 31, 2025 at 11:15 AM t (776795891_202997_08-31-2025_11-15-45_1-414-243-1392_97028). Case Agent reviewed the call and immediately recognized the male voice of the person answering the phone to be Russell MCDADE Sr.

119. Case agents reviewed record jail calls made from Marquan Owens PIN on September 22, 2025 at 10:37 AM to **414-243-1392 (Target Cell Phone 2)** (788983861_556929_09-22-2025_10-37-41_1-414-243-1392_56861). Case agents immediately observed that the phone was answered by the voice of Russell MCDADE Sr. It should be noted

that Marquan Owens was a frequent caller to Russell MCDADE's prior telephone number 414-439-7468. During this call Owen's states that it is "Quan" and questions MCDADE about when he was ever going to answer this number.

**M. MCDADE's Contacts to Law Enforcement Agencies**

120. As described above, MCDADE has a history of attempting to voluntarily assisting law enforcement, while he has been being investigated. During these attempts he has provided law enforcements agencies with contact numbers which has assisted case agents in their investigation.

**a. MCDADE Contact to Waukesha Sheriffs using 414-439-7468**

121. Waukesha County Sheriff Detectives Aaron Hoppe and Daniel Coates were contacted in April 2025 by a male reporting to be "RJ" / "Russ" from the numbers 414-439-7468 and 414-491-0454. Prior to these calls, Detective Hoppe received numbers 414-439-7468 and 414-491-0454 during a debrief from an inmate charged in a pending federal matter. The inmate wanted "RJ"/"Russ" to conduct 3rd party cooperation on the inmate's behave and stated "RJ"/"Russ" was the inmate's relative, "Russell McDade". Detective Hoppe was not interested and was aware of the investigation into MCDADE.

**b. MCDADE Contact to DEA using 414-439-7468**

122. On May 28, 2025, telephone number 414-439-7468 contacted the Eastern District of Wisconsin United States Attorney's Office**.** The caller was a male who identified himself as Russell MCDADE. MCDADE stated that he had important information to turn over to law enforcement. MCDADE's contact information was provided to DEA Task Force Officers (TFOs) Sean Mayerbock and Tim Filter.

123. DEA TFOs Mayerbock and Filter called 414-439-7468 and spoke to an individual that identified himself as "Russ". DEA TFO Mayerbock had previously spoken with MCDADE regarding a drug investigation and was familiar with his voice. TFO Mayerbock identified "Russ" as MCDADE. The conversation was recorded, given the ongoing investigation into MCDADE. TFOs Mayerbock and Filer reported that during the call with MCDADE, there was a third party who appeared to have been called from another phone in possession of MCDADE. This would be consistent with MCDADE possessing more than one cellphone. This party was identified as "Mike".

**c. MCDADE Contact to ATF using 414-439-7468**

124. Case agents were notified that on July 28, 2025, MCDADE called the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and requested to cooperate with special agents. MCDADE provided the name "RJ" and stated he previously cooperated with agents at ATF. MCDADE indicated he had information about a shooting that occurred on 18th and Arrow that occurred about an hour before he called ATF. MCDADE also stated that he had information about a person supplying rifles to prohibited person in Milwaukee. Special Agent Matthew Mason pressed the caller for additional information if the caller wanted to actually cooperate, and the called then provided the name "Russell MCDADE" and telephone number 414-439-7468. Agent Mason indicated he would meet with MCDADE on July 29, 2025. However, Agent Mason became aware of the federal investigation into MCDADE and MCDADE's past attempts to cooperate in order to obtain information on his own investigations. On July 30, 2025, Agent Mason received a call from 414-439-7468 but at this point Agent Mason texted 414-439-7468 that he would call back later, attempting to avoid MCDADE.

**d. MCDADE Contact to DEA using 414-243-1392 (Target Cell Phone 2)**

125. Case agents were notified that on September 19, 2025, telephone number **414-243-1392 (Target Cell Phone 2)** sent texts to DEA TFO Robert Gregory. The individual identified themselves as "R.J." and indicated that they wished to give information to the police. TFO Gregory was already aware of the investigation into MCDADE and prior attempts to contact law enforcement. TFO Gregory was also aware that "R.J." is a nickname used by MCDADE and notified case agents.

**e. MCDADE Contact to MPD using 414-243-1392 (Target Cell Phone 2)**

126. Case agents were notified that on September 25, 2025, a male, believed to be MCDADE based on the investigation into telephone number **414-243-1392 (Target Cell Phone 2)** and MCDADE's historical tactics of injecting himself in law enforcements investigation following search warrants of drug houses connected to his trafficking business, called the MPD sensitive crimes. The male requested to speak with MPD Detective Baldwin, who was unavailable at the time. Detective Chauncey Harris, familiar with MCDADE's tactics spoke to the caller. The male then indicated he MCDADE provided the name "Jay". The male stated he knew detectives were involved in an investigation of "Union Street". The male stated he wanted to provide information about a missing female. The male then inquired about Detective Harris' ethnicity and previous work location, district assignment. The male stated he would provide an address to a house on 25th and Mineral, which Detective Harris encouraged the male to text the information. The male requested to meet him for additional information. Given historical concerns about MCDADE methods of using guise of providing information to law enforcement, when MCDADE is really actually attempting to learn what information law enforcement may

have obtained against him, detective declined to meet. No further contact has been made with "Jay" at **414-243-1392 (Target Cell Phone 2).**

**N. Surveillance of STAIR September 2025**

127. Case agents observed through electronic and physical surveillance that STAIR's movements where generally consistent with the movement of STAIR's telephone number **414-732-3682 (Target Cell Phone 3)**.

128. Case agents also reviewed electronic surveillance from near S2 Real Estate Building located at 2925 West Lincoln Avenue, Milwaukee, Wisconsin.

129. Case agents were able to document that **414-732-3682 (Target Cell Phone 3)** consistently communicated with towers in the area of STAIR's known residence, 11512 West Woodside Drive, Hales Corners, Wisconsin. I observed consistently that during weekdays (Monday through Friday) **414-732-3682 (Target Cell Phone 3)** would leave the area of 11512 West Woodside Drive, Hales Corners, Wisconsin and consistently be seen on electronic surveillance arriving in his Tesla, parking on the east side parking lot of the S2 Real Estate Building. Case agents observed STAIR exiting his Tesla and entering the east side entrance of the building. The following is a list of the observations dates/time by case agents:

- 9-2-2025 –STAIR captured arriving at S2 Building at 11:47 AM;
- 9-3-2025 - STAIR captured arriving at S2 Building at 12:32 PM;
- 9-4-2025 - STAIR captured arriving at S2 Building at 1:31 PM;
- 9-5-2025 - STAIR captured arriving at S2 Building at 11:38 AM;
- 9-8-2025 - STAIR captured arriving at S2 Building at 11:01 AM;
- 9-9-2025 - STAIR captured arriving at S2 Building at 12:08 PM;
- 9-10-2025 - STAIR captured arriving at S2 Building at 11:52 AM;
- 9-11-2025 - STAIR captured arriving at S2 Building at 11:52 AM;
- 9-12-2025 - STAIR captured arriving at S2 Building at 12:11PM;
- 9-15-2025 - STAIR captured arriving at S2 Building at 11:17 AM;
- 9-16-2025 - STAIR captured arriving at S2 Building at 11:21 AM;

– 9-17-2025 - STAIR captured arriving at S2 Building at 12:14 PM;

130. Case agents also conducted electronic surveillance in the evening hours and observed that STAIR would move in conjunction with **414-732-3682 (Target Cell Phone 3)** after leaving the area of S2 Building 2925 West Lincoln Avenue, Milwaukee, Wisconsin and appeared to travel to the location of his residence, area of 11512 West Woodside Drive, Hales Corners, Wisconsin again during the evening hours. Based on my training and experience, these observations were consistent with STAIR possessing **414-732-3682 (Target Cell Phone 3).**

131. On September 8, 2025, case agent conducted a surveillance operation at the S2 Real Estate building located at 2925 West Lincoln Avenue, Milwaukee, Wisconsin. Case agents observed that STAIR left the building on September 8, 2025 at approximately 5:44 pm in his Tesla. STAIR drove his Telsa to 6405 South 27th Street, Franklin, Wisconsin (Badger Mobile Home Community). At approximately 6:20 pm, case agents observed STAIR park his Tesla and walk to the location of Lot # 10. (Figure 11) Case agent observed STAIR speaking with a heavy set white male outside this location. For a short time the two of them walked out of view behind a vehicle.

132. At approximately 6:31 pm, case agents observed STAIR walking back to his Tesla. Case agents used a recorded UC line to contact STAIR's telephone **414-732-3682 (Target Cell Phone 3)** at this time. As case agents contacted **414-732-3682 (Target Cell Phone 3),** case agents observed STAIR reach his right hand into his right pocket and appeared to manipulate something. Case agents then observed that STAIR's telephone **414-732-3682 (Target Cell Phone 3)** call was sent to voicemail. This would be consistent with STAIR manipulating **414-732-3682 (Target Cell Phone 3)** and ignoring the UC call placed by case

agents.



(Figure 11)

133. Case agent then followed the STAIR in his Tesla to the area of his residence 11512 West Woodside Drive, Hales Corners, Wisconsin and observed the Tesla parked inside the garage at his residence at 6:52 PM.

134. Case agents were already familiar with the location of 6405 South 27th Street, Franklin, Wisconsin (Badger Mobile Home Community) from the investigation into the DTO. Case agents previously reviewed a recorded jail call between Amber VALADEZ's PIN to MCDADE's new telephone number **414-460-9608 (Target Cell Phone 1)** on September 3, 2025 at 7:58 am (778188713_553878_09-03-2025_07-58-25_1-414-460-9608_55458). During the call VALADEZ asks MCDADE Sr. to give the phone to "Wally", who case agents have identified as Walter RINGERSMA (DOB XX/XX/1965), one of MCDADE's drug runners. While VALADEZ is speaking to RINGERSMA, RINGERSMA states that he plans to move to the area of S 27th St. / College where "Sam" has a mobile home to rent on the 15th of the month. Case agent believes that RINGERSMA is referring to the trailer park where STAIR was observed by

case agents on September 8, 2025. RINGERSMA speaks about the fact that he is diagnosed with cancer and wants stop doing "girl" for a portion of his life. Case agents know from training and experience that "girl" is a common term used by drug dealers and users to mean cocaine. RINGERSMA then states that he was caught with "2,840 grams of powder", but was not prosecuted because he said he was not inside the room and therefore he didn't know what was in the room. Case agent knows from training and experience that "powder" is a term used by drug dealer and users to refer to powdered cocaine, as opposed to "crack" cocaine which has been mixed with cutting agents and "cooked". Case agents are aware the RINGERSMA was arrested in 2025 related to multiple kilograms of cocaine being seized from a hotel room.

135. Case agent also knows that although MCDADE had changed his numbers **414-460-9608 (Target Cell Phone 1)** and **414-243-1392 (Target Cell Phone 2),** there is ongoing communication between MCDADE's phone **414-243-1392 (Target Cell Phone 2)** and STAIR's phone number **414-732-3682 (Target Cell Phone 3),** consistent with them still engaged in drug trafficking. A review of the call detail records for STAIR's phone number **414-732-3682 (Target Cell Phone 3)** show that between August 28, 2025 and September 16, 2025 there were 38 communications between **414-732-3682 (Target Cell Phone 3)** and **414-243-1392 (Target Cell Phone 2).** Case agents further observed there was no communication between **414-732-3682 (Target Cell Phone 3)** and **414-460-9608 (Target Cell Phone 1)**. This communication between STAIR's **414-732-3682 (Target Cell Phone 3)** and MCDADE's telephone **414-243-1392 (Target Cell Phone 2)** (which appears to be used for more personal business) is also consistent with the past business line communications, although there were a few occasions when STAIR's phone would communication with the old "Dope Line" (414-514-3794) associated with

MCDADE this communication was far less frequent.

136. Case agent also knows from training and experience in drug investigations that phones are a vital part of the business model that is used by those engaged in drug distribution. Due to this fact drug traffickers know that phones become a vital portion of the case agents' investigations used to prosecute drug traffickers. Therefore, at times when drug traffickers believe that they might investigated they will often times switch phones numbers as a precaution to deter the law enforcement investigation. It should be noted that case agents have observed that MCDADE has previously changed both his phone numbers during the months of March and April of 2025.

**O. Search Warrant at 1512 South 21st Street, Milwaukee, Wisconsin**

137. On September 23, 2025, MPD executed a state search warrant at 1512 South 21st Street, Milwaukee, Wisconsin, which was previously identified as a stash house for MCDADE, owned by S2 Real Estate Group 3 LLC, Sam STAIR. Prior to the search warrant, MPD officer contacted a traffic stop Javarius WILLIAMS, who was observed leaving 1512 South 21st Street, Milwaukee, Wisconsin just prior to the traffic stop. WILLIAMS was on a Facetime call at the time of the traffic stop. Within less than five minutes of WILLIAMS traffic stop, numerous subjects, including Stacey BERRY and AV-1, were observed leaving 1512 South 21st Street, Milwaukee, Wisconsin and going to 1541 South Union Street, Milwaukee, Wisconsin, where MPD also executed a state search warrant.

138. Inside 1512 South 21st Street, Milwaukee, Wisconsin, law enforcement located discovered multiple operational digital scales, hundreds of hypodermic needles, numerous boxes of baking soda (a common item used to make crack cocaine) and over a dozen nasal

doses of Naloxone (which is used to counter the effects of an overdose). Officers also located numerous identifiers for BERRY as well as multiple notebooks, which based on training and experience were consistent with the sale of narcotic. Law enforcement also located a black 9 mm polymer semi-automatic handgun (no serial number) and a .380 Ruger, bearing serial number R75-508058, semiautomatic handgun. MPD also located a green leafy substance which tested positive for THC with a total weight of 615g; a grayish powdery substance which tested positive for cocaine and weighed .42g; a bright orange oval pill which tested positive for amphetamine and weighed .70g.

139. MPD also located in another room at 1512 South 21st Street, Milwaukee, Wisconsin, a note that stated "Basement Rules; Don't Touch what doesn't belong to you; 20 min sessions – add-ons must be $10 or more to obtain more session mins to stay inside; If you make a mess clean it up or you will be suspended from sessions".

140. MPD also located a sign on a room which was consistent with MCDADE being connected to the property (Figure 12). The sign stated "No one allowed (even if im in the room) ONLY PEOPLE ALLOWED IN ARE… Stacey Ro G If you are NOT ONE of These 3 people DO NOT ENTER! BTW DON'T ASK ME FOR SHIT! ANSWER IS NO!!! Based on my training, experience, and investigation into the DTO, this sign is consistent with Stacey Berry (Stacey) "G" and MCDADE (Ro) likely being in control of this stash house (1512 South 21st Street, Milwaukee, Wisconsin). Further, the statement "DON'T ASK ME FOR SHIT!" would likely refer to obtaining free controlled substances from the drug dealer put in charge of the stash house.




(Figure 12)

141. On September 28, 2025 Stacey BERRY and several other individuals were charged for firearm and drugs offenses in relation to the state search warrants at 1512 South 21st Street, Milwaukee, Wisconsin, and 1541 South Union Street, Milwaukee, Wisconsin in Milwaukee County Cases 2025CF4512, 2025CF4514, 2025CF4513, and 2025CF4515.

142. Case agents spoke with AV-1, who was also present at 1512 South 21st Street, Milwaukee, Wisconsin, and 1541 South Union Street, Milwaukee, Wisconsin during the search warrants. During the interview AV-1 was in custody regarding a probation violation. AV-1 has prior convictions for misdemeanor property offense, disorderly conduct, and drug possession. AV-1 also has a prior felony drug offense.

143. AV-1 stated she meet “Ro”, who she identified has a “legal name” of “Russell” through another friend around March 2024. AV-1 stated “Ro” is a drug dealer and deals in a variety of controlled substances including cocaine and heroin. AV-1 stated “Ro” worked with S2 Realty and “Sam”. AV-1 stated that “Ro” rented 1512 South 21st Street, Milwaukee,

Wisconsin and another location on 14th and Greenfield (identified by case agents as 1425 West Greenfield Avenue, Milwaukee, Wisconsin) from "Sam" at S2. AV-1 also stated that "Jeanett", a girlfriend of "Ro" also worked for S2. AV-1 stated that S2 would get notice from law enforcement if police were going to raid S2's properties and Jeannett would let "Ro" know before police raided the property. AV-1 stated "Ro" had her clean up property for S2 a few times. AV-1 stated her received a personal check at S2 written by "Sam", but Jeanett provided it to AV-1.

144. AV-1 stated "Ro" let AV-1 live at 1512 South 21st Street, Milwaukee, Wisconsin but that is got "too hot", so she moved to 14th and Greenfield for a short period of time. AV-1 explained that she meant too much attention was coming to the residence due to the amount of drug trafficking of the 1512 South 21st Street, Milwaukee, Wisconsin. AV-1 stated that "Stacey" was released from prison and eventually moved into 14th and Greenfield and began running the drug house for "Ro". AV-1 stated things then got "too hot" on 14th and Greenfield, so the drug house was moved back to 1512 South 21st Street, Milwaukee, Wisconsin. AV-1 stated "Stacey" ran things [referring to the drug house] for "Ro" at 1512 South 21st Street, Milwaukee, Wisconsin. AV-1 stated that 1541 South Union Street, Milwaukee, Wisconsin was a drug customer of "Ro's" not a drug house used by "Ro".

145. AV-1 further stated that she has observed "Ro" with kilograms of cocaine and multiple grams of heroin. AV-1 stated that "Ro" will use the residence at 14th and Greenfield to "cook" the cocaine to crack cocaine. AV-1 also described how the residence at 14th and Greenfield has camera in the front and back and a TV inside that allows people to watch the cameras. AV-1 also stated that "Ro" carries a firearm. AV-1 stated there were cameras also

at 1512 South 21st Street, Milwaukee, Wisconsin, but the cameras did not work.

146. AV-1 stated she owed "Ro" rent money for residing at 1512 South 21st Street, Milwaukee, Wisconsin. AV-1 stated that "Stacey" paid "Ro" for the money AV-1 was short. AV-1 stated that "Stacey" then made AV-1 engaged in penis to mouth sexual intercourse for money in order to repay "Stacey" for the money. AV-1 stated she had to do this twice, and it was with the same date. AV-1 stated that the first time she received $100 and the second time she received $40. AV-1 had to provide "Stacey" with all the money.

147. AV-1 further stated "Ro" was planning to move his drug house to 18th and Greenfield, near a gas station, just before the state search warrant at 1512 South 21st Street, Milwaukee, Wisconsin.

**P. Service Provider and Prior Court Order**

148. On May 19, 2025, case agents obtained an order authorizing the installation and use of pen register for 414-514-3794 and 414-439-7468 from Honorable Magistrate Judge Nancy Joseph for both Dish Wireless and AT&T service providers. Case agents served the orders on May 21, 2025 and was informed on May 23, 2025 by Dish Wireless that it is the service provider for 414-514-3794 and 414-439-7468; however it subcontracts services with AT&T, and other networks given its technology limitations. AT&T has been providing case agents information as to the court authorized pen register and trap and trace for 414-514-3794 and 414-439-7468.

149. On June 5, 2025, Honorable Magistrate Judge William E. Duffin authorized court electronic surveillance for 414-514-3794 and 414-439-7468 which case agents served on the service provider.

150. On July 3, 2025, Honorable Magistrate Judge William E. Duffin authorized an extension for court electronic surveillance for 414-514-3794 and 414-439-7468 which case agents served on the service provider. Information obtained from the Service Provider is consistent with MCDADE engaged in ongoing drug trafficking. This expired in August 2025.

151. On August 19, 2025, Honorable Magistrate Judge Stephen C. Dries authorized court electronic surveillance for MCDADE's prior telephone numbers 414-514-3794 and 414-439-7468 and STAIR's telephone number **414-732-3682 (Target Cell Phone 3)** which case agents served on the Service Providers. During the investigation, case agents determined MCDADE changed his telephone numbers to **414-460-9608** with **IMEI: 356830361124670** (the "**Target Cell Phone 1**") and **414-243-1392** with **IMEI: 352700320439870** (the **"Target Cell Phone 2"**) with DISH network. STAIR's telephone number **414-732-3682 (Target Cell Phone 3)** warrant has since experience.

152. Case agents believed based on the ongoing investigation into the DTO that court authorized electronic surveillance of MCDADE's new telephone numbers **414-460-9608 (Target Cell Phone 1)** and **414-243-1392 (Target Cell Phone 2)** and STAIR's telephone number **414-732-3682 (Target Cell Phone 3)** will continue to assist in the investigation of the DTO. Case agents believe that the historical location data requested for the **Target Telephones** will continue to assist in identifying DTO stash locations and corroborating the locations of DTO members during relevant events such as the previously completed controlled buys. I believe that the call detail records requested will continue to help identify other DTO members and potential sources of supply. I believe that the requested prospective location data will continue to assist in proactive surveillance of DTO members

and will aid in the identification of DTO members/suppliers, stash locations, and meeting locations.

## IV. TECHNICAL BACKGROUND

153. Case agents believe from all the above information provided that MCDADE, STAIR and others continue to be involved in the distribution of illegal drugs. Case agents also believe that MCDADE and STAIR continue to use the **Target Cell Phones** in the course of their illegal activities, including communicating with known and unknown co-conspirators. Case agents further believe MCDADE and STAIR has made and will continue to make frequent visits to locations in which they stores and distributes narcotics, including likely meeting drug sources. Case agents believe that the continued historical and prospective monitoring of the **Target Cell Phones**' location will assist in identifying potential other sources of supply, distributors, and locations associated with the DTO.

154. I believe **Target Cell Phones**, whose service providers are Dish Wireless LLC a wireless telephone service provider, which often roam on the AT&T, T-Mobile, and other networks given its technology limitations and subcontracts it has with other service providers, and T-Mobile, (collectively "Service Providers"), contains valuable information that could be used as evidence for the distribution and possession with intent to distribute controlled substances; conspiracy to distribute and possess with the intent to distribute controlled substances; maintain drug involved premises; use of a communication facility in furtherance of a drug trafficking offense, violations of Title 21, United States Code, Sections 841, 843(b), 846, and 856.

155. Based on my training and experience, I know that Service Providers can collect historical and prospective cell-site data and historical and prospective E-911 Phase II data about the location of the **Target Cell Phones**, including by initiating a signal to determine the location of the **Target Cell Phones** on Service Providers' network or with such other reference points as may be reasonably available.

156. In my training and experience, I have learned that the Service Providers is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

**Cell-Site Data**

157. Based on my training and experience, I know that the Service Providers can collect cell-site data on a prospective basis about the **Target Cell Phones**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone

numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Providers typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

**E-911 Phase II / GPS Location Data**

158. I know that some providers of cellular telephone service, including Service Providers, have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.

159. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

160. I also know that certain wireless providers, such as Service Providers, can provide precision location information, also known as estimated location records or historical handset location data, on both a historical and prospective basis. Each provider refers to its proprietary

estimates of a cellular device's location differently. This information, however, is sometimes referred to as geolocation information (PING), Network Event Location System (NELOS) data, Global Positioning System (GPS) data, cell tower triangulation or trilateration, round-trip time or real-time tool (RTT), per-call measurement data (PCMD), historical E911 data, or precision measurement information.

161. Based on my training and experience, I know that Service Providers also can collect per-call measurement data, which Service Providers also refers to as the "real-time tool" ("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

162. Accordingly, cell-site data is typically less precise than E-911 Phase II data. Based on my training and experience, I know that the Service Providers can collect E-911 Phase II data about the location of the **Target Cell Phones**, including by initiating a signal to determine the location of the **Target Cell Phones** on the Service Providers' network or with such other reference points as may be reasonably available.

**Pen-Trap Data**

163. Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a

Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

**Subscriber Information**

164. Based on my training and experience, I know that wireless providers such as the Service Providers typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Providers typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the **Target Cell Phones** user or users and may assist in the identification of co-conspirators.

165. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify **Target Cell Phone**s' user or users, the locations of that user or users, and the patterns of that user or users. A frequency analysis of the telephone communications between MCDADE, STAIR and other identified and unidentified subjects is material, in that it can establish whether the calls described

above are a deviation from their normal patterns of communication. The frequency analysis of the locations associated with the cellular devices can establish whether the locations are deviations or consistent with normal patterns. This information is relevant to show whether MCDADE, STAIR and others acted-in-concert, by establishing the nature and extent of their relationship, the existence and scope of the conspiracy, the pattern of their communications, their patterns of travel, and any deviations from those patterns.

## V. AUTHORIZATION REQUEST

166. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

167. I further request that the Court direct the Service Providers to disclose to the government any information described in Section I of Attachment Bs that is within its possession, custody, or control.

168. I also request that the Court direct the Service Providers to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment Bs unobtrusively and with a minimum of interference with the Service Providers' services, including by initiating a signal to determine the location of the **Target Cell Phones** on the Service Providers' network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Providers for reasonable expenses incurred in furnishing such facilities or assistance.

169. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice

until April 29, 2026, pursuant to the Omnibus Order signed by Honorable Judge Stephen C. Dries on April 29, 2025. This investigation is expected to remain covert at least until then, so disclosing the warrant would alert targets or subjects about the existence of a federal investigation. This investigation targets a sophisticated drug trafficking organization with multiple targets, subjects, and witnesses. Case agents will continue to request the same notification deadline for all warrants in this investigation, so that the notifications can be coordinated or extended as necessary. A single notification date will reduce the administrative burden on case agents and the Court, minimize the risks of disclosure, and promote judicial economy. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Cell Phones** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment Bs, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

170. Because the warrant will be served on the Service Providers, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court

authorize execution of the warrant at any time of day or night, owing to the potential need to locate the **Target Cell Phones** outside of daytime hours.

**ATTACHMENT A1**
**Property to Be Searched**
**MATTER NUMBER 2024R438**

1. Records and information associated with the cellular devices assigned call number **414-460-9608** with **IMEI: 356830361124670** (the "**Target Cell Phone 1**") and **414-243-1392** with **IMEI: 352700320439870** (the **"Target Cell Phone 2"**) with listed subscriber unknown, whose service provider is Dish Wireless LLC ("Service Provider") a wireless telephone service provider headquartered at 9601 Meridian Blvd, Englewood, CO 80112, with services also attached to AT&T, headquartered at 1025 Lenox Park Blvd., Atlanta, GA 30319 or any other cell phone servicing company currently servicing these phone numbers and IMSI number's during the requested period.

2. The **Target Cell Phone 1 and 2**.

**ATTACHMENT B1**
**Particular Things to be Seized**
**MATTER NUMBER 2024R438**

## I. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A1 is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A1:

a. The following subscriber and historical information about the customers or subscribers associated with the **Target Cell Phone 1 and 2** for the time period from August 1, 2025, to present:

i. Names (including subscriber names, user names, and screen names);

ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii. Local and long distance telephone connection records;

iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Target Cell Phone 1 and 2**, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(B) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

b. Information associated with each communication to and from the **Target Cell Phone 1 and 2** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phone 1 and 2**or will connect at the beginning and end of each communication.

The Court has also issued an order(s) pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the **Target Cell Phone 1 and 2**.

c. Information about the location of the **Target Cell Phone 1 and 2**for a period of **30 days**, during all times of day and night. "Information about the location of the **Target Cell Phone 1 and 2** includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by

initiating a signal to determine the location of the **Target Cell Phone 1 and 2** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of distribution and possession with intent to distribute controlled substances; conspiracy to distribute and possess with the intent to distribute controlled substances; maintain drug involved premises; use of a communication facility in furtherance of a drug trafficking offense, violations of Title 21, United States Code, Sections 841, 843(b), 846, and 856, have been committed by Russell V. MCDADE (DOB XX/XX/1980), Samuel P. STAIR, a.k.a. "Sam STAIR", (DOB XX/XX/1974), Walter RINGERSMA (DOB XX/XX/1965), Russell V. MCDADE JR. (DOB XX/XX/2003) and other unidentified subject(s) since at least August 2024.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this warrant.

## <u>ATTACHMENT A2</u>
## Property to Be Searched
## MATTER NUMBER 2024R438

1. Records and information associated with the cellular devices assigned call number **414-732-3682** (the **"Target Cell Phone 3"**) with listed subscriber Samual P. STAIR, and listed address of 11512 W. Woodside Dr, Hales Corners, WI, whose service provider is T-Mobile ("Service Provider") a wireless telephone service provider headquartered 4 Sylvan Way, Parsippany, NJ 07054;

2. The **Target Cell Phone 3**.

<u>**ATTACHMENT B2**</u>
**Particular Things to be Seized**
**MATTER NUMBER 2024R438**

## III. Information to be Disclosed by the Provider

To the extent that the information described in Attachment A2 is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A2:

a. The following subscriber and historical information about the customers or subscribers associated with the **Target Cell Phone 3** for the time period from September 1, 2025, to present:

    i. Names (including subscriber names, user names, and screen names);

    ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

    iii. Local and long distance telephone connection records;

    iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

    v. Length of service (including start date) and types of service utilized;

    vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

    vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Target Cell Phone 3**, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(B) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received).

b. Information associated with each communication to and from the **Target Cell Phone 3** for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the **Target Cell Phone 3** or will connect at the beginning and end of each communication.

The Court has also issued an order(s) pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the **Target Cell Phone 3**.

c. Information about the location of the **Target Cell Phone 3** for a period of **30 days**, during all times of day and night. "Information about the location of the **Target Cell Phone 3** includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by

initiating a signal to determine the location of the **Target Cell Phone 3** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## IV. Information to be Seized by the Government

All information described above in Section I that constitutes evidence and instrumentalities of distribution and possession with intent to distribute controlled substances; conspiracy to distribute and possess with the intent to distribute controlled substances; maintain drug involved premises; use of a communication facility in furtherance of a drug trafficking offense, violations of Title 21, United States Code, Sections 841, 843(b), 846, and 856, have been committed by Russell V. MCDADE (DOB XX/XX/1980), Samuel P. STAIR, a.k.a. "Sam STAIR", (DOB XX/XX/1974), Walter RINGERSMA (DOB XX/XX/1965), Russell V. MCDADE JR. (DOB XX/XX/2003) and other unidentified subject(s) since at least August 2024.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this warrant.